# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN RAY | ) | |
| 300 Himmershee Street, No. 5 | ) | |
| Fort Lauderdale, FL 33312 | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| MARC CHAFETZ | ) | |
| 5105 Chevy Chase Parkway, NW | ) | |
| Washington, DC 20008 | ) | |
| | ) | |
| Respondent | ) | |

## PETITIONER'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PETITION TO VACATE ARBITRATION AWARD

Petitioner, John Ray, submits this Memorandum of Points and Authorities in Support of his Petition to Vacate the Arbitration Award issued on February 24, 2016. As indicated in the aforementioned petition, Mr. Ray seeks relief from the Award for Costs and Attorneys' Fees for the following reasons: 1) the award was issued almost one year after this arbitration was terminated and its issuance demonstrated a manifest disregard for the law; 2) the arbitrator exceeded his powers in issuing the award.

## BACKGROUND

Arbitration began when Susan Ray filed a demand for arbitration with the AAA, on October 10, 2013. At the time the demand for arbitration was filed, John Ray, Susan Ray's former husband, was not named as a party. Nevertheless, for a time while they were together, they combined their considerable talents in the field of mass torts. John Ray has a significant background and experience in marketing and consulting with law firms in the field of mass torts.

Susan Ray had a background in science and the medical field as well as a background in business. They successfully forged their experiences and talents into a lucrative consulting business.  Over the years, they sponsored, established and maintained hundreds of websites that would attract queries from individuals who suffered injuries from defective products or drugs and who were looking for help and advice.

Susan Ray, with the help of John Ray, formed marketing firms that would take leads acquired from the Rays' multiple websites and refer those leads to law firms.  In order to enhance the revenue from this enterprise, the Rays' business model included the formation of a law firm where one of the Rays, or both of them, could be a non-lawyer partner in a law firm with a licensed attorney.  Since the District of Columbia Bar sanctioned law firm partnerships involving lawyers and non-lawyers,[1] Susan Ray founded the Beltway Law Group (hereinafter "BLG") in 2011 under D.C. Code § 29-601.

Mrs. Ray's marketing company, BDS Systems, Inc., (hereinafter "BDS") a Texas LLC, advanced the operating expenses for BLG since the time of its incorporation in February 2012 until recently. These expenses included office space, telephones, computers, IT systems,

---

[1]     Rules of Professional Conduct: 5.4 (b) Professional Independence of a Lawyer provides:

(b)  A lawyer may practice law in a partnership or other form of organization in which a financial interest is held or managerial authority is exercised by an individual non-lawyer who performs professional services which assist the organization in providing legal services to clients, but only if:

(1)  The partnership or organization has as its sole purpose providing legal services to clients;

(2)  All persons having such managerial authority or holding a financial interest undertake to abide by these Rules of Professional Conduct;

(3)  The lawyers who have a financial interest or managerial authority in the partnership or organization undertake to be responsible for the non-lawyer participants to the same extent as if non-lawyer participants were lawyers under Rule 5.1;

(4)  The foregoing conditions are set forth in writing.

accounting services and other expenses necessary to run a business.  These advances by BDS were treated as loans to BLG that were to be repaid.

The Rays' business model was very creative. The prospective clients who responded to the Rays' websites would be screened by the marketing company (BDS). The source of the revenue required to operate the marketing company (BDS) and the websites came from trial law firms who made deposits towards advertising costs. In exchange for deposits towards advertising costs, the law firms would get referral leads that were compatible with the law firm's business and clientele. If a lead from a potential client was accepted, the lead would then be sent to a trial law firm with which BLG had co-counsel agreements.

If the case that was referred to co-counsel law firms received funds from a settlement or a favorable verdict, the law firms that made a marketing deposit were entitled to deduct from the settlement or verdict the amount paid to BLG.  The fees were then distributed in accordance with the Master Counsel Agreements.  By the end of 2012, BLG had entered into a large number of co-counsel agreements and had a substantial docket of active matters pending that had significant seven-figure value.

Also, by the end of 2012, BLG's existing lawyer partner was resigning from BLG. To remain in compliance with Rule 5.4, BLG sought a replacement lawyer partner licensed to practice law in the District of Columbia. Marc Chafetz answered an ad placed by BLG in Craig's List and applied for the partner position. After months of negotiations and after Mr. Chafetz re-drafted and re-worked the BLG, LLP Agreement giving himself a significant share of the partnership, he finally joined BLG in December of 2012 and signed the LLP Agreement.[2]  It should be noted that

---

[2]    Exhibit 2 – BLG, LLP Agreement which defined the division of responsibilities between Susan Ray and Marc Chafetz in ¶ 1.10

Mr. Chafetz brought neither capital nor sweat equity to the BLG partnership.  Nor was Mr. Chafetz responsible for, or contribute to, BLG's operating expenses, which were being supplied during this time by BDS. Although Mr. Ray was not a signatory to the LLP Agreement, he did sign a Distribution Agreement[3] which specified how revenues were to be distributed.  Mr. Ray's primary focus was on marketing and generating business for BLG.

Approximately six months after Mr. Chafetz joined BLG, the relationship between Susan Ray and Marc Chafetz became strained. On June 16, 2013, Mr. Chafetz wrote a memo to John and Susan Ray in essence terminating John and Susan Rays' relationship with BLG.  Mr. Chafetz also stated in the memo that he was taking BLG's clients and, without any discussions with the Rays, he notified all co-counsel law firms and BLG's clients that Susan has been dismissed from BLG "for cause."[4]  Mr. Chafetz failed to cite any provision in the BLG Partnership Agreement that entitled him to take such a drastic step. Moreover, he failed to articulate with any degree of particularity the basis for this memo. Nor was any justification cited by Mr. Chafetz's to explain his unilateral communications with clients and co-counsel law firms of BLG informing them that Mrs. Ray was terminated "for cause."

Within a few weeks of the June 17th memo from Mr. Chafetz, Susan Ray received a letter from Mr. Chafetz's attorney from Zuckerman Spaeder.[5]  The letter proposed that Mrs. Ray transfer her interest in BLG to Mr. Chafetz. There was no mention of compensation to Mrs. Ray for the transfer of interest in the letter.  The letter further stated that in the event of dissolution, Mr. Chafetz would notify the BLG's clients as to BLG's status. Such a notification would impact BLG's

---

[3]   Exhibit 3 – Distribution Agreement - ¶ 3 provided that, "the Parties will distribute all revenue ("Revenue" is defined as gross revenue received by BLG after subtraction of operating expenses) received by BLG as follows: John: 32.5%, Susan 32.5% and Marc 35%.  Such distributions to be made on a quarterly basis.  .  .  . '

[4]   Exhibit 4 – Memo from Marc Chafetz to John and Susan Ray dated June 17, 2013 Ex 44 pdf 24.

[5]   Exhibit 5 – Zuckerman Spaeder's letter to Susan Ray dated July 11, 2013.

existing client relationship.  In essence, Exhibit 5 was a threat to destroy the good will of BLG that Susan and John Ray worked so hard to establish.

There were other actions on the part of Mr. Chafetz that seriously questioned his loyalty to his fiduciary duties to BLG.  For example, Mrs. Ray learned that Mr. Chafetz, while still a partner at BLG, established a website advertising his North American Law Partners as a mass tort law firm that was almost identical to BLG website model.[6]  BLG also did business as American Law Partners.  Therefore, Mr. Chafetz created a website that could easily be confused with and compete with BLG.  In addition, Mr. Chafetz opened a bank account for BLG at Wells Fargo, without Susan Ray's knowledge. After opening the Wells Fargo account, Mr. Chafetz directed Wells Fargo to send bank statements to his home address. He also directed co-counsel law firms to send settlement payments to the same Wells Fargo account.[7]  It is important to note that the address that was used for the BLG Wells Fargo account was the same as Mr. Chafetz' home address. Such actions unequivocally demonstrated a serious breach of Mr. Chafetz's fiduciary duty to BLG and a threat to negate the investment of time and money that the Rays placed in the company.

Another example that created concern between the Rays was the discovery of an e-mail from Mr. Chafetz giving a member of a co-partner law firm, Sean McCrary, wiring instructions to send funds to the Wells Forgo bank account.[8]  The thrust of the e-mail exchange was that Mr. Chafetz directed a member of a co-partner law firm to send disbursements to BLG's account at Wells Forgo. The Wells Fargo bank account was unknown to Mrs. Ray. Shortly after this e-mail surfaced, and seeing it as the last straw, Mrs. Ray filed a demand for arbitration seeking dissolution

---

[6]   Exhibit 6 – Chafetz competing website with BLG.

[7]   Exhibit 7 – Wells Fargo Bank Account established by Mr. Chafetz for BLG.

[8]   Exhibit 8 - E-mail chain between Chafetz and McCrary regarding disbursing funds to Wells Fargo Account.

of BLG and a winding up of its affairs.[9]   The need for dissolution has not been contested by Respondent.

Mrs. Ray's Demand for Arbitration, as previously mentioned, was filed on October 10, 2013.  Although arbitration is normally a more expedited path to dispute resolution, this arbitration took a more tortuous and tumultuous course. The dispute resolution path became littered with accusations of misconduct and counter accusations exchanged between counsel, multiple motions for costs and attorneys' fees, and two separate attorneys representing Susan Ray deciding to voluntarily withdraw from the case. Finally, there have been four arbitrators assigned to this matter.

With regard to the appointment of multiple arbitrators in this matter, § 12.13 of Exhibit 2, the LLP Agreement, provides specific instructions to the AAA regarding the appointment of an arbitrator.  These instructions are important because the instructions are relevant to this Petition to Vacate.  Arbitration is a matter of contract between the parties and is a way to resolve disputes that the parties have agreed to submit to arbitration. *Masurovsky v. Green,* 687 A.2d 198, 205 (D.C. 1996). The arbitration clause in the LLP Agreement provides specific instructions how arbitration is to be handled.  First, the arbitration clause provides that the controversy "**shall be settled by arbitration in the District of Columbia** in accordance with the Rules of the AAA." (Emphasis added).  Second, the arbitrator **shall** be a person agreed to by each partner to the dispute within 30 days.  .  .  .   Third, if the parties are unable within such 30-day period to agree upon an arbitrator, **then the panel shall be one arbitrator selected by the District of Columbia office of the AAA.** (Emphasis added.)  Finally, Exhibit 2 states that the arbitrator **shall be experienced in the area**

---

[9]   Exhibit 9 – S. Ray's Demand for Arbitration seeking dissolution and winding up of BLG. Mrs. Ray filed an Amended Statement of Claim but the Amended Demand for Arbitration is not relevant at this time for the purpose of this discussion.

**of legal partnership** and shall be knowledgeable with respect to the subject matter of the dispute. (Emphasis added.)

Of the four arbitrators appointed to arbitrate this case, only the first arbitrator, the Honorable Ricard Levie, met all the requirements of the arbitration clause in the LLP Agreement, Exhibit 2.

One of the early orders by Judge Levie during this arbitration was Interim Order No. 2, issued on December 31, 2013.  This order denied Mr. Chafetz's counsel's request to represent BLG in any business dispute or litigation and arbitration.[10]  Nevertheless, there were occasions when counsel for Mr. Chafetz violated this order without any consequences.

Another significant order from Judge Levie was issued on March 31, 2014.  Again, Mr. Ray was still not a party.[11]  In the March 31 Order, Exhibit 11, Judge Levie found that pursuant to § 10.1 of the LLP Agreement, a Liquidating Event occurred.  Judge Levie further found that the conduct of and conflicts between the Managing Partners (Susan Ray and Marc Chafetz) made it impossible to carry on the business of the Partnership.[12]  Judge Levie also found that the banking records indicated that there was less than $1,000 available in BLG's bank account and therefore, the Claimant failed to show that there was a need for a receiver.[13]

Judge Levie's Interim Order also mentioned collateral litigation in North Carolina and the establishment of an escrow account by counsel for Mrs. Ray and a newly formed BLG, NC where funds for BLG were being sent. The collateral litigation in North Carolina involved a suit filed by John Ray against Beltway Law Group (BLG) for the value of Mr. Ray's services to BLG in the

---

[10]   Exhibit 10 – Judge Levie's Order dated December 31, 2013.

[11]   Exhibit 11 – Judge Levie's Interim Order of March 31, 2014.

[12]   *Id.*  at page 3.

[13]   *Id.*  at page 5

amount of $525,000. This action was taken as a result of Mr. Chafetz' intentional breach of their agreement as evidenced by Exhibit 4 where Mr. Chafetz dismissed Susan Ray for cause and made a claim for all of BLG's clients. The establishment of the trust account for BLG, NC undoubtedly gave rise for concern by Judge Levie who may have been unaware of the reasons such actions were taken. Undoubtedly, the BLG, NC trust account was established in North Carolina to protect Susan Ray's investment of time and money into BLG from Mr. Chafetz.

It is important to note that in his Interim Order, Exhibit 11, Judge Levie ordered BLG dissolved. He also ordered, among other things, that BLG shall continue **solely for the purpose of winding up its affairs** in an orderly manner pursuant to § 10.2 of the Amended Partnership Agreement (emphasis added). The Order also provided that Mr. Chafetz's counsel establish a trust escrow account for the benefit of BLG under certain terms and that no disbursements be made from this account without the expressed written consent of Susan Ray. Susan Ray was also ordered to transfer funds in the North Carolina trust account to the account established by Mr. Chafetz's counsel.[14] The thought of turning over the financial aspects of BLG to the attorney of the man who tried to fire Susan Ray and take over the business did not, understandably, sit well with the Rays. The reason for Judge Levie's decision to turn over the records to Respondent's counsel is because this decision conflicted with § 1.10 of the LLP Agreement which made Susan Ray responsible for all general business matters. In essence, Judge Levie improperly re-wrote the partnership agreement.

Although Judge Levie's Order required the supervision of the arbitrator to wind up the affairs of BLG as well as the need for transparency in the financial records,[15] the Respondent did

---

[14] *Id.* at page 6.
[15]    *Id.* at page 4.

not follow the directives of this order.  First, there does not appear to be a winding up of the affairs of BLG. Although Judge Levie mentioned that there was less than $1,000 in the bank at the time his Interim Order was issued, the most recent trust account report show a closing balance of $184,901.71.[16]  One can see from the trust account reports that BLG continued to grow instead of winding down. Secondly, there has been a lack of transparency involved in the reporting since Settlement sheets from co-partner law firms showing what was paid and how much was paid were never made available to Mrs. Ray. Settlement sheets are used to verify the amount deposited in the BLG bank account was the same amount paid to BLG by co-partner law firms. Susan Ray still has no way of verifying whether the amounts deposited in the BLG trust account were the complete and total amounts received from co-partner law firms.  Finally, there is evidence that at least one disbursement from the BLG trust account in the amount of $12,000 was made to the AAA without Mrs. Ray's approval.  AAA knew that this disbursement was in violation of Judge Levie's order, but kept the money anyway.  There was a notable failure to do anything about these transgressions and violations of Judge Levie's Order by the AAA or subsequent arbitrators.

On October 30, 2014, Judge Levie resigned as arbitrator without providing any notice to the parties.  Judge Levie was replaced by Judge Ittig who ruled that Mr. Chafetz' counterclaims would be permitted on January 15, 2015.  Mr. Chafetz filed a counterclaim against multiple entities and parties, including John Ray on April 9, 2014.[17]

The appointment of Judge Ittig was protested by the Rays because the appointment was made in contravention to § 12.13 of the LLP Agreement, Exhibit 2.  Judge Ittig later agreed that

---

[16]   Exhibit 11 – Trust Account Report for the period January 25 to February 1, 2016.

[17]   Although Mr. Ray was not a signatory to the LLP Agreement, Exhibit 2, that contained the arbitration clause, he was deemed an intended beneficiary to the arbitration by the court in North Carolina.

she did not have the experience in legal partnerships required in the LLP Agreement.[18] Before Judge Ittig withdrew, however, she suspended the arbitration until arbitration fees were paid by the parties. If the payments were not made by a specific deadline, Judge Ittig ruled that the arbitration would be terminated.

An e-mail trail from the Vice President of AAA, John Bishop, unequivocally stated that the arbitration was terminated pursuant to Judge Ittig's order because payments of arbitration fees were not made in a timely manner. *See* Exhibit 12.  With the declarative statement in Exhibit 12 that "this matter is now terminated," the arbitration involving the parties should have concluded.

However, a few days after the arbitration was terminated, on March 6, 2015, counsel for Mr. Chafetz sent a 10-page letter to Mr. Bishop of the AAA criticizing the decision to terminate the arbitration. Counsel's letter to Mr. Bishop engaged in disparaging comments about the Rays and threatened to "file an emergency motion for a temporary restraining order seeking judicial intervention."[19] The intimidation worked.  On March 11, 2015, Mr. Bishop notified the parties that the AAA made an "administrative decision" to reopen the matter for further administration.[20]

Despite repeated requests, the AAA has failed to cite one case or even an applicable AAA Rule authorizing the reopening of arbitration once that arbitration was terminated. Since March 11, when the decision was made to reopen arbitration, the Rays have made repeated requests for the justification of AAA's decision, although on one occasion AAA Rule 57 (f) was cited as Mr. Bishop's justification to reopen arbitration. An examination of Rule 57(f), however, provides no

---

[18]   Exhibit 12 – E-mail chain from John Bishop, Vice President of the AAA.

[19]   Exhibit 13 – Clinton Letter to AAA dated March 6, 2015.

[20]   Exhibit 14 – AAA e-mail reopening arbitration dated March 11, 2015.

justification.[21]  Those specific Rules made no provisions for reopening a matter once that matter has been terminated.

During the following months, the Rays repeatedly objected to each phase of the arbitration proceeding after it was terminated.  In filing after filing, the Rays described the post-termination proceedings as *ultra vires.*  Nevertheless, the AAA pushed the arbitration forward.

On December 8, 2015, the new arbitrator, Robert E. Margulies, who was appointed by the AAA in contradiction to § 12.13 of the LLP Agreement, conducted a hearing in this matter over the phone.  Mr. Margulies has his office in Jersey City, NJ, is not a member of the D.C. Bar, and was not appointed by the local office of the AAA as required by the arbitration clause in the LLP Agreement.

On January 13, 2016, the undersigned counsel entered his appearance on behalf of Mr. John Ray in this matter and sent a letter to the AAA with a copy to all counsel and the arbitrator, Mr. Margulies.[22]

The letter to the AAA cited case law holding that the failure to pay arbitration fees allowed the arbitration to be terminated and a party to an arbitration proceeding that is terminated for non-payment waives his/her rights to further arbitration, citing *Pre-Paid Legal Services, Inc. v. Cahill,* 786 F.3d 1287, 1294 (10th Cir. 2015); *Brown v. Dillard's Inc.,* 430 F.3d 1004, 1012-13 (9th Cir. 2005).  Neither Arbitrator Margulies nor the AAA responded to counsel's letter.  Nevertheless, counsel's January 13 letter placed both the arbitrator and AAA on notice that there was no legal justification to proceed with arbitration once that arbitration was terminated.  Notwithstanding the

---

[21]    AAA Rule 57(f) provides that if the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full deposits requested within the time provided after the suspension, the arbitrator, or the AAA if the arbitrator has not been appointed, may terminate the proceedings.

[22]    Exhibit 15 – D. Murray's letter to AAA dated January 13, 2016

lack of legal support to proceed, on February 24, 2016, Arbitrator Margulies issued his award for costs and attorneys' fees against Mrs. Ray and Mr. Ray.  It is important to note that Mr. Ray has been a minor participant in the proceedings.

Finally, it is clear that both the AAA and Arbitrator Margulies were on notice that there were no AAA Rules that allowed for the reopening of arbitration once it was terminated.  Secondly, both were made aware of case law that contradicted allowing the reopening of a terminated arbitration.  Both the AAA and Arbitrator Margulies knowingly acted without any legal justification.  And, the decision to proceed with arbitration and issue the February 24 award demonstrated a manifest disregard for the law.  Therefore, Arbitrator Margulies' award should be vacated.  Moreover, all arbitration proceedings that occurred after the arbitration proceeding was terminated should be vacated.

## DISCUSSION

### A.   Arbitrator Margulies' Award of Costs and Attorneys' Fees Should Be Vacated Because It Manifested a Disregard for the Law.

The Federal Arbitration Act (FAA) provides the statutory language that should be considered when determining whether an award should be vacated.  9 U.S.C.A. § 10 (a) provides as follows:

In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration –

(1)    where the award was procured by corruption, fraud, or undue means;

(2)    where there was evident partiality or corruption in the arbitrators, or either of them;

(3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)     where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

To vacate an arbitration award on grounds of manifest disregard for the law, the party challenging the award must establish that: (1) the arbitrators knew of a governing legal principle, yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2nd Cir. 1998).

In applying this ruling to the facts of this case, it has been established that the AAA lacked the legal authority to reopen a case that was terminated by the ruling of Judge Ittig. Moreover, the AAA confirmed the ruling of Judge Ittig and informed the parties that the arbitration was terminated. *See* Exhibit 12. This Exhibit is an e-mail from the Vice President of the AAA that declared the arbitration terminated. Moreover, when the "administrative decision" was made to reopen the case, the AAA could not cite any AAA Rule or case law that gave legal justification to its "administrative decision." The AAA should be well aware of its own Rules and should have known that there was nothing in the Rules that allowed an arbitration to be reopened once it was terminated.

On January 13, 2016, more than a month before Arbitrator Margulies issued his award for costs and fees, undersigned counsel sent a letter, Exhibit 15, to Mr. Bishop of the AAA with a copy to Mr. Margulies. In essence, Exhibit 15 clearly pointed out that the AAA's reliance of Rule 57(f) was misplaced. The letter also clearly stated that there were no AAA Rules in existence that authorized the reopening of arbitration once that arbitration was terminated and case law from the 9th and 10th Circuits supported the Mr. Rays' argument that a case terminated for non-payment of fees constituted a waiver of the right to arbitrate.

Nevertheless, despite the clear legal justification supporting Mr. Ray's argument, the AAA and Mr. Margulies deliberately and willfully forged ahead with the arbitration without even a meager attempt to address the legal arguments presented in Exhibit 15.

In *Halligran,* the Second Circuit found that there was a manifest disregard for the law and thereby reversed the lower court's ruling affirming the arbitration award. *Halligran* was a case of age based discrimination despite the fact that Mr. Halligran had been among the Piper Jaffray's top salesmen. There was abundant evidence in the record that Mr. Halligran's employers constantly commented about his age, and that he was too old. All of the multiple comments about Mr. Halligran's age were made before he was terminated. After extensive hearings, the arbitrators denied the relief sought by the Mr. Halligran and entered an award in favor of the company. The award for the company did not contain any explanation or rationale for the result. The plaintiff petitioned the district court to vacate the award under 9 U.S.C. § 10 (a) because the award reflected a manifest disregard for the law. 148 F.3d at 200.

The Second Circuit found that in view of the strong evidence, Halligran was fired because of his age. The Court reversed the award and held that the arbitrators ignored the law or the evidence or both. Moreover, the arbitrators did not explain the award. *Id.* at 204.

In this case, the Rays constantly objected to the continuation of the arbitration after it was terminated. Requests for a legal justification for the reopening of the arbitration were never sufficiently answered. Exhibit 15 that clarified the law on the termination of arbitrations and the lack of authority to reopen a case was deliberately ignored. Therefore, the conduct of the AAA and Mr. Margulies demonstrated a complete disregard for the law and Mr. Margulies' award should be vacated.

The District of Columbia follows the same principles announced in *Halligan.*  Namely, a court may vacate an award only if there is a showing that one of the limited circumstances enumerated in the FAA is present, or if the arbitrator acted in manifest disregard of the law. *LaPrade v. Kidder, Peabody & Co.,* 246 F.3d 702, 706 (D.C. Cir. 2001).  Although in *LaPrade* the award was not vacated, in affirming the award, the Court found that the law in question was neither well defined, explicit nor clearly applicable to the case.  *Id.* at 705.

Here, the law regarding AAA reopening an arbitration case that was terminated was clearly defined and applicable. There was no AAA Rule permitting such an action. The only way arbitration can be revisited after termination is to file another demand for arbitration.  The AAA failed to propose to any party the filing of another demand for arbitration. Instead, the AAA ignored its own Rules and made an "administrative decision" that had neither legal support nor a factual basis. Mr. Margulies complicated the process by disregarding the lack of justification in the AAA Rules that would justify reopening a terminated case and ignored case law cited to him in Exhibit 15. Mr. Margulies failed to conduct any proper inquiry as to legal justification for the AAA to reopen this case.  In view of the above circumstances, Arbitrator Margulies' award of costs and attorneys' fees should be vacated.

Finally, since Exhibit 12, a communication from the AAA stating emphatically that the arbitration is "now terminated, "the doctrine of *functus officio* should also apply thereby vacating the award. According to *Black's Law Dictionary* (9th Ed.), this doctrine states that having performed his or her function, an officer or official body is without further authority. *Mercury Oil Refining Co. v. Oil Workers Intern. Union, CIO,* 187 F.2d 980, 983 (10th Cir. 1951) Therefore, every action taken by the AAA and its arbitrators after the matter was terminated was without authority and should be ruled null and void.

**B.    The Award Should Be Vacated Under U.S.C.A. § 10 (a)(4) Because the Arbitrator Exceeded His Powers.**

9 U.S.C.A. §10 (a) (4) allows for the vacation of an arbitrator's award when the arbitrator exceeds his/her powers.  As previously mentioned, arbitration is a contract between the parties and is a way to resolve disputes that the parties have agreed to submit to arbitration.  *Masurovsky v. Green,* 687 A.2d 198, 205 (D.C. 1996).  As such, an arbitration decision may be vacated under FAA § 10 (a) (4) on the ground that the arbitrator exceeded his powers.  Only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of justice should an award be vacated.  An arbitrator's task is to interpret and enforce a contract, not to make policy. *Stolt-Nielson S.A. v. Animal Feeds Int'l Corp.,* 559 U.S. 662, 663, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010).

The arbitration clause that bound the parties to arbitration is contained in § 12.13 of Exhibit 2.  There is no provision for sanctions in this agreement.  In this case, Respondent's counsel based his claims for fees, costs and sanctions on alleged violations on Rule 11 of the Federal Rules of Civil Procedure. There is no indication in the AAA Rules that the Federal Rules of Civil Procedure were adopted.  Even if Rule 11 applies under Rule 81, Rule 11 applies to representations made to the court "whether by signing, filing, submitting or later advocating" where such representations were made for "improper purposes." Assuming there was any validity to Respondent's arguments under Rule 11, there is no provision in the LLP Agreement for an award of sanctions.

The language in Exhibit 2 in § 12.13 provides that, "[t]he losing party shall bear any fees and expenses of the arbitrator, other tribunal fees and expenses, reasonable attorney's fees of both parties, any costs of producing witnesses and any other reasonable costs or expenses incurred by him or the prevailing party or such costs shall be allocated by the arbitrator."  Therefore, if there

are allegations that the conduct of the Rays delayed or added to the expense of the arbitration, it is at the end of the arbitration, in the final award, that the arbitrator awards such reasonable fees and expenses to the prevailing party, and not in response to a motion for sanctions.

Although AAA Rule 58 does address sanctions, such sanctions are awarded under this rule where a party fails to comply with its obligations under these rules or with an order of the arbitrator. Here, there is no evidence that Mr. Ray, or even Mrs. Ray, failed to comply with their obligations under the rules. Mr. Ray has been on the periphery of this arbitration since its inception. He was found to be an intended beneficiary of the LLP Agreement even though he was not a signatory to that agreement for a considerable time after this arbitration began. Moreover, Mr. Ray had a good faith basis to infer that the arbitration was terminated when the termination was published by the AAA on March 2, 2015. *See* Exhibit 12. He further had a good faith belief of not participating directly in the arbitration for concerns about waiving any argument that the arbitration was terminated. Finally, for the arbitrator to find that Mr. and Mrs. Ray are jointly and severally liable for fees and cost, when Mr. Ray's participation in the arbitration process was minimal, is unreasonable and unfair. This is especially true where the arbitrator gave no reasons for supporting a finding of joint and several liability.

Respondent may argue that the courts have limited review of the arbitration process. Although judicial review of the arbitration process is limited, the Supreme Court has indicated that such review is sufficient to ensure that arbitration comply with the requirements of the statute. *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, at 32 n.4, 111 S. Ct. 1647, 114 L. Ed. 2d 26. (1991)

Undoubtedly in this case, the arbitrator exceeded his authority by going outside the language of the arbitration clause in Exhibit 2. The power to award attorneys' fees in the manner

adopted by Arbitrator Margulies should not be presumed. *MCR of Am. v. Greene,* 881 A.2d 331 (Md. 2000). Since there is no provision in the LLP Agreement that supports an award for sanctions and since neither of the Rays violated any obligations under the AAA Rules, the award of sanctions should be vacated as a violation of § 10 (a)(4).

## CONCLUSION

Arbitrator Margulies' award of attorneys' fees and cost that was issued on February 24, 2016 should be vacated because it was issued approximately one year after the arbitration was terminated and the *ultra vires* continuation of the arbitration was improper and constituted a manifest disregard for the law. Secondly, the award should be vacated because it exceeded Arbitrator Margulies' authority. The record is clear that the sanction award was premised on Rule 11 of the Federal Rules of Civil Procedure, which do not apply, and the award was issued in contravention of and outside the scope of the arbitration clause contained in the LLP Agreement.

Respectfully submitted,

/s/ Dwight D. Murray
Dwight D. Murray, # 228932
dmurray@steinmitchell.com
STEIN MITCHELL CIPOLLONE BEATO & MISSNER, LLP
1100 Connecticut Avenue, NW, Suite 1100
Washington, DC 20036
202-737-7777 ▪ Fax 202-296-8312
Attorney for John Ray

March 3, 2016